The first case is number 2008-3053, Franklin, against the Department of the Treasury. Mr. O'Neill, you may begin when you're ready. If you may please the court, my name is Daryl O'Neill and I represent the appellant, Mr. Howard Franklin. We're here today to respectfully request this court reverse the decision of the Marist System Protection Board. We make that request for two reasons. One, the Marist System Protection Board erred when it stated that the agency established that there was a nexus between Mr. Franklin's off-duty conduct and the mission of the IRS. Two, the Marist System Protection Board erred when it stated that the agency established that Mr. Franklin's conduct was conduct unbecoming. The government has provided this court with two pieces of inaccurate information. The first piece of information that was provided to this court was that Mr. Franklin was disciplined for two similar incidents. That is absolutely correct. Mr. Franklin was just- That is absolutely- I'm sorry, did you say correct or incorrect? Incorrect. There was one incident and then the failure to attend the sexual harassment training classes? That's correct, Your Honor. And Judge Bryson, that actually stemmed from the same case. Right. Mr. Franklin- The sexual harassment was the requirement associated with the original disciplinary action, right? Well, that's what the court would leave- that's what the government would leave this court to believe, but that's not the case. Well, that was not true? No, Your Honor. It was the relationship between the sexual harassment training and the person? Well, what happened was Mr. Franklin, he was charged- he was actually removed for sexual harassment. Mr. Franklin appealed this case to the Marist System Protection Board. The administrative law just specifically stated that the government could not maintain this case and we should work out a settlement agreement. Mr. Franklin worked out a settlement agreement. He said that I don't want to be a supervisor anymore if this is how this is going to be. And as part of the settlement agreement, Mr. Franklin agreed to dismiss all his pending EEO cases. So what ended up happening is once it was all done, he still became- he was still a GS-7, like he was a GS-7 when he was removed in this particular case. So Mr. Franklin went back to work, maybe a month or two later, ordered him to go to one-on-one POS training. Mr. Franklin says, hey, this is not part of my settlement agreement. So he filed an EEO complaint. And while that EEO complaint was pending, they disciplined him 45 days. So it actually stemmed from the same case. And that was my point I was trying to make. And what was the discipline then for? The discipline was for not attending the one-on-one POS training. But his position was that you ordered me something that was not in my settlement agreement. And, you know, you're violating the terms of my settlement agreement. So he filed a complaint to have that settlement agreement reheard. What was the resolution of that complaint? Well, the EEO is actually still pending. That EEO and that one-on-one POS training is still pending as of today. That was not taken to the Merit Systems Protection Board on the ground of it's a violation of the settlement agreement, or was it? It was not taken on the violation of the settlement agreement. It was just taken on a- actually, it was taken on a violation. He took it to the Merit Systems Protection Board basically saying that there is no such thing as one-on-one POS training. You guys are developing something specially for me, and this is just improper. Well, now, when you said EEO, did he take that complaint to the Merit Systems Protection Board? Or when you said EEO, you're not- No, he took it to the EEOC. Yes, sir, to the EEOC. You are talking- Yeah, he actually filed the EEOC. But not the Merit Systems Protection Board? He also did file a Merit Systems Protection Board. And what's the status of that? And that was actually upheld because the Merit Systems Protection Board said when you're given an order, unless that order is something that's going to harm you, you must comply with that order. So his 45-day suspension was upheld by the board? It was upheld. But like I said, the actual- whether or not he should have been ordered to the one-on-one POS training is still pending before the EEOC as we speak now. But the issue of the propriety of the order was before the Merit Systems Protection Board, and they ruled against him. That is correct, Your Honor. Okay. In regards to the nexus, the agency alleged that Mr. Franklin's conduct actually occurred during the lunch period or during the break time. That's what they actually put before the- they never established when it occurred. They just said it may have occurred lunchtime, it may have occurred during his break time. Just for the record, his supervisor testified that Mr. Franklin- she told Mr. Franklin that his lunch periods and his break time was his own time. And in fact, if Mr. Franklin was out at lunch and he got injured, he wouldn't receive any workers' compensation benefits. Do you think it matters? It makes a difference? I mean, assuming this all occurred at lunchtime, if this conduct occurred with respect to some women working at the Wendy's across the street, if all of this had happened at the Wendy's across the street as opposed to- we all agree, I don't know how we define worksite, but it occurred at the worksite. Do you agree with that? It occurred in the building in which his office is housed. It did occur in the building his office housed. So do you consider that the worksite? Well, forget that. Do you agree that there's a difference whether it occurred there or at the Wendy's across the street? No, I mean, that's my point, Your Honor. If that conduct would have occurred at the Wendy's across the street, I mean, because- and that's what the agency is attempting to do, they're attempting to go too far. If that conduct would have occurred at Wendy's or McDonald's or Lenny's, which is also in his building, then if they could have come across and said, you've got an IRS employee that's over here off duty and he's bothering us, you need to do something about it. And to say that they could come back and discipline him for conduct that has no relations to his job. Well, assume hypothetically that the lessor or the owner of the building in which the IRS office was housed was just dismayed at the allegations by the security guards and sent the IRS a letter and said, you're out of here in 30 days. We're just not going to put up with this. Our security guards are not happy. You're out of that. Assume that. Would you then agree that there's some nexus between what he was doing and the efficiency of the service? Well, the question becomes, if that happened, because those are not the facts in this particular case. I'm asking, I said it was a hypothetical. Okay. But if that was to happen, the first question becomes, how does Mr. Franklin's conduct affect the mission of the IRS? Well, it requires them to find a new place, which would be a pretty substantial. That's correct. It would in that particular case. But in this particular case, that did not happen. Okay, so let's go back to my hypothetical and see if you can answer that. So would you agree that in my hypothetical, one could make the case then that there was some nexus? I'm having a hard time saying yes, Your Honor, because I don't think- Well, isn't there, I mean, his conduct led to the eviction of the IRS from its offices. Okay. And if his conduct led to the eviction of the IRS, you know what I mean, led to the eviction of the IRS, then your argument would be that it affects the mission of the IRS. I'm not making an argument here. I'm asking you to answer a question. Well, because the next question becomes, how does it affect the mission of the IRS? Right. I mean, and I think that's the answer. If it does not affect the mission of the IRS, which is to collect taxes, then how is there a nexus between his conduct and the mission of the IRS? Don't you think the mission of the IRS, even any agency, but particularly the IRS, can be defined more broadly than collecting taxes? I mean, doesn't it have to represent itself to the public and to taxpayers as being honest, truthful, respectful, blah, blah, blah? I mean, isn't that included in what's expected and required of the IRS? Well, Liana, that's actually included in what is expected to be a human being. I agree. But, I mean, what we're saying is we're going too far. I mean, because, I mean, here's what happened. I mean, here's what we're talking about here. We're talking about a security guard that allegedly that Mr. Franklin was standing by, only standing by her workstation. I mean, that's what he was charged. I mean, specification four was he was standing by the workstation, and the manager of the building said, I need to talk to my security guard so she can appear, not to be distracted. And he left. What is conduct going to be coming about that? I mean, and that was the question I asked the administrative law judge. I mean, if you say no one, I mean, his supervisor, and if you look at the appellate's argument on page, his supervisor specifically said she never told Mr. Franklin that he could not stand by the guard station. His supervisor's supervisor said. Okay, so what's your argument here? Are you arguing that the level of his conduct wasn't sufficient or that there was no nexus? Because let's assume then hypothetically that what he did, we could all agree, was improper, inappropriate, disrespectful, whatever. Then do you agree that that establishes enough of a nexus with respect to the efficiency of the service? You know, that's the second part of my argument. I don't think, I mean, and that's the other thing is whether the conduct itself was egregious. I mean, because, I mean, firstly, you know, we're talking three specifications where it's standing by a guard station and no one had asked him to leave. Well, what do you, do you agree with the, I guess the MSPB definition of unbecoming was somewhere unattractive, unsuitable, detracting from one's character, reputation, creating an unfavorable impression. Do you have any issue with that definition? It's a two-pronged test, Your Honor. That's the second part of the prong. The first part of the prong is the employee engaged in a specific kind of touching upon his role as a federal employee. That's the first part of the prong. The second part of the prong is the employee and the conduct was improper and detracted from the appellants. I mean, the second part, if he was rude, and in this particular case we're saying he was rude, if he was rude, then, of course, that could detract from the agency. But the first part of it is how does that affect his role as a federal employee? And I'm just saying, they made, portions of this test were missed. I mean, you know, like we said, if it's off-duty conduct, this court has said, when we start talking about off-duty conduct, we start talking about egregious conduct. I mean, in the line of cases that this court has ruled in regards to off-duty conduct, the court has, you know, in Health and Human Services, there was a child molestation case. The court said that that was egregious conduct. In a case where a guy was convicted of theft, the court said that basically because he pleaded no to contendory, it still was egregious conduct. But those, of course, are cases in which somebody is, for example, it's the weekend and they're off 30 miles from their workstation and nobody who they're dealing with knows they're federal officers. This is in the same building. Let's assume the conduct for a moment, and I understand your argument that this is not particularly heinous conduct, but let's assume it was really, really serious sexual harassment, touching, whatever you want, and it occurred on the elevator on the way up to his office. Is it your argument that that's fair game, that that cannot be the subject of disciplinary action because he hadn't gotten to his floor yet? No, Your Honor, that conduct is criminal. Well, okay, but let's assume it's a little less than criminal, but it still would be, we would all agree that it's a lot worse than anything that is alleged in this case. I'm trying to take the seriousness of the conduct out of the picture so that we don't agree it's serious. But it occurs on the elevator, but the elevator hasn't gotten to the IRS floor yet. That's still, isn't there a nexus there? By virtue of the fact that everyone knows that he's an IRS agent, that it's in the context of the building where the IRS is housed, he may not have actually arrived across the threshold of the IRS premises, but it's still in the work environment. Well, the first part of it is he's not in the work environment as of yet. Because like we said, when we start talking about the work environment, we've got to start talking about how much protection he gets. Because in the work environment, you get protection. For instance, my earlier analogy was talking about the workers' compensation benefits. If you start getting benefits, you're getting paid. And if you do something while you're getting paid, you should be held 110% accountable for those actions. Okay, but to go back to my example, is it your argument that as long as he hasn't stepped off the elevator and in fact stepped through the hall and into the IRS offices, there's no nexus? What I'm saying, Your Honor, is in order for that to be a nexus, the conduct, it has to be, the court has said it has to be strictly looked at. And in this particular case, it was not strictly looked at. I mean, we're talking about a situation where Mr. Franklin, the security guard said, Mr. Franklin never touched her, never tried to kiss her, never whispered in her ear, never said anything derogatory. Clearly his presence was unwelcome and he remained notwithstanding her efforts to get him to leave. You've got to take the testimony of the other witnesses, the ones that said that they stood there for 40 minutes and never heard her say, Mr. Franklin, leave this place or never heard her tell Mr. Franklin to leave and never heard Mr. Franklin say anything to her. I mean, there was one witness testify that he stood there for 40 minutes and Mr. Franklin was standing there and he never heard Mr. Franklin say anything and he never heard her tell Mr. Franklin to leave. Even the building manager said that she never told Mr. Franklin to leave. Your Honor, I have a question. Can I ask one quick question? Sure. Is there anything in the record, it seems like there was no disagreement that everybody knew who everyone was here. I'm sorry? That everyone knew who everyone was here, that he was known to be an employee of the IRS. Do you have, is there anything in the record to indicate, I assume most federal employees, not particularly IRS employees, wear some identification badge around their neck? They do not. That was one of the arguments, he had an EEO agreement file on that because the agency refused to give him an ID badge. So he did not, they did not know he was an actual employee of the IRS. And basically on May 10th, he was... Somebody must have figured it out eventually, right, because somebody wrote a complaint to his supervisor or whoever. I mean, there was some contact with the IRS. Right, I mean, and that was, like I said, that was on May 10th, but I mean, actually Mr. Franklin told the security guard when he first got there that he was coming there to work at the IRS. I mean, they had been carrying on casual conversations about whatever, I mean, she was trying to find different jobs, you know, I mean, that's what it all turned out to be. And, you know, I don't have a bottom line. Okay. We'll give you back a couple of minutes of rebuttal time. We've asked you a lot of questions. Thank you, Your Honor. Thank you. Farewell. Well, you're not Bryant Snee. For some reason I'm Bryant Snee down here. Do I have the wrong name? Oh, John Goodman. All right. Morning. Is that the wrong name? Sorry. Thank you. Ms. Goodman? May it please the Court. The decision of the MSPB should be affirmed because it correctly determined that there was a nexus between Mr. Franklin's misconduct and the efficiency of the IRS's service, and because Mr. Franklin's conduct were actions that were unbecoming. What is work? I mean, the AHA kept repeatedly said this occurred at work. What, in your view, does that mean? Would that extend to the sidewalk outside the building, the restaurant across the building? What does at work mean? In this context, whether at work would extend to what occurred outside the building, that may be a more difficult case, depending on what hour of the day, why he was across the street. But in this case, because the government presented evidence that this did mean, in fact, that pursuant to 5 CFR 551.411B, that even his breaks are considered on-duty time, and that Mr. Franklin provided no evidence to the contrary, that he was doing this at lunch or on his breaks other than at work. But that's a little bit different. I mean, take what you said. But I wasn't dealing with the temporal aspect of it. I was dealing with the physical location aspect of it. So, I mean, you would agree. I mean, what he did at Wendy's, even if it was on his lunch time, would you say that would be considered at work because his lunch time was still considered on-duty time? Is that what you're saying? No, Your Honor. That most likely would not be considered at work. However, there still could be a nexus to the official CFPB. Well, if he held up the Wendy's and shot the cashier, I assume that the agency would be a little unhappy with him. Correct, Your Honor. Or, as in this case, if the IRS had a business relationship with the Wendy's, there could be a nexus to. But sufficiently egregious conduct that has no direct relation to the workplace can nonetheless be sanctioned. Yes, Your Honor. We've certainly said that. But what we're talking about here is, I think, isn't the equivalent of holding up the Wendy's. I think everybody can agree to that. Yes, Your Honor. So what is it about the physical location here that ties the nexus in, in your view, sufficiently to make this affect the efficiency of the service? In this case, there are a number of connections between what occurred in the lobby of the building and the efficiency of the IRS. First, Mr. Franklin was directing his actions towards the security guards of the building such that the security of the IRS employees within the building could be affected. Second, the IRS's contact with the building and business relationship with the building, the fact that they had leased space from the building, and that the building manager specifically said to the IRS in her letter, we cannot have this person building, we cannot have this conduct in our building, thereby impacting the IRS's relationship with the building manager and the place where they leased their property from. Additionally, there are a number of times that the people in the building contacted various supervisors of the IRS, thereby diverting their attention from their regular duties to what Mr. Franklin's actions in dealing with his conduct. And finally, as Your Honor suggested. But if we're going to take that into account, do we have to also evaluate the legitimacy of those complaints? I mean, what if you have some crazy landlord who's always complaining about everything? And so it could be that an employee who's perfectly within their rights and doing things that are not objectionable to any reasonable person would arise the ire of some crazy landlord. And then the landlord would be calling the IRS all the time, making all sorts of demands with respect to this employee. That wouldn't be enough, right? No, Your Honor. So we have to evaluate also, not just that they got the complaints, but some sort of reasonableness or legitimacy of the complaints. Is that what we're required to do as well? Well, the court was first determined whether or not the government, the administrative judge determined first that the government had proven that this conduct was unbecoming of a federal employee. Once that was determined, the administrative judge then went on to determine whether there was a nexus or connection to the efficiency of the service. So getting to that point first requires that there be a determination that the agency was not responsible. In addition, there's a nexus to the efficiency of the agency because the reputation of the agency was put into question based on Mr. Franklin's actions. Many of the people within the building knew that Mr. Franklin was an IRS employee. In fact, the building manager says that she was not aware of who he was and asked one of her other employees, who is Mr. Franklin, to which she was told his name is Mr. Franklin. He's an employee of the IRS. Thereby imputing the two together and really relating his conduct to the reputation of the IRS. It was well known in the lobby of the building who Mr. Franklin was employed by. The fact that the IRS would continue to maintain its employment after it was asked to discontinue it and after it was told that his employment was hindering the security in the building would, again, impact on the reputation of the IRS as an agency. There is also an issue that Mr. Franklin was in the lobby and specifically in contact with taxpayers and the public who walked through the door. And the IRS does have a duty to, as a federal agency, uphold a certain standard of its reputation when it puts itself out to the public. But there's no indication that just people walking around the building who happen to be taxpayers or citizens would necessarily know who he was? No, there is no evidence. I assume they're on three floors of this building. I don't know how many floors the building has, but I assume there are other employees of other agencies or entities in the building as well? Yeah, sure. It's not clear who else was in the building from the record, but it is clear that the IRS has three floors of this building. But there's no way that any member of the general public walking around the lobby would know who was employed by the IRS or employed by anyone else, right? It's possible. However, in this case, there is evidence in the record that, and it's in the letter from the building manager to the IRS, which is on F-A-18, that Mr. Franklin, in fact, did ask people who came through the door and taxpayers if they needed assistance in finding the taxpayer collection office. Do we have anything in the record to indicate how large this building is? I mean, do they have three floors of a four floor building or do they have three floors of a 65 story? No, Your Honor, there's no evidence that it, the IRS did have floors five, six, four, six, and seven. So at least a seven floor building. I don't know any more than that. All right. That's fine. Thank you. In addition to there being a nexus between Mr. Franklin's misconduct and the efficiency of the agency, Mr. Franklin's conduct was clearly unbecoming under the definition used by the MSPB. Unbecoming conduct is that which is unattractive, unsuitable, or detracting from one's character or reputation or creating an unfavorable impression. It's clear that Mr. Franklin's actions, um, as his attorney characterized were rude or even boorish. This is conduct, which essentially rises to the level of harassment and by its very nature is therefore unbecoming. He repeatedly spoke to the security guards, use profane language when speaking to them and continually, um, ask them out when he was repeatedly asked not to and to leave their station. Therefore, this conduct is unbecoming. And for these reasons, we ask. What was the, what was the, there was a, a specification with respect to profane, uh, language. I don't, I don't recall what that specification was. Um, in specification, which spec is that? Specification number one, your honor, the language that he used when, uh, misfits refused to get on the elevator. Oh, okay. I guess it depends on what you mean by profane. I, I, I was certainly aware of that, but there, there isn't any other allegation of profanity, uh, with respect to any of his visits to the security guard in the security guard area. No, your honor. All right. Um, the, the, do you, do you agree with Mr. O'Neill's, uh, explanation to us of the, uh, incident for which he was suspended and the suspension for the, uh, failure to attend the, the sexual harassment training class? Your honor, um, I, I do not have that information. I do know what's in the record is that he was first suspended for 30 days for harassing employees within his own office. And then again, for failure to attend the prevention. I don't have more. I think he, he essentially filled in some of the details, but there you, you don't, nothing about what he said is inconsistent with your understanding of the record. Nothing's inconsistent, but I can't either confirm. Understood. That's fine. Thank you. And for these reasons, the department of treasury asked that the decision of the MSPB be affirmed. Mr. O'Neill. Thank you, your honor. Your honor, um, I'd like to direct this court to, uh, the appendix 50 of, uh, of our brief and specifically what the manager of the security guard testified to in regards to her security guard. She specifically said that misfits had a bad temper. She was rude. This is on page 51. She was rude to the customers page 51. She disobeyed orders, uh, page 50. She was butting head with the clientele. She was very temperamental. These are all the things that the manager of the building was saying about her security guard. Here's the problem with that. If this security guard, it's a lot made up with the administrative law judge made a lot of the fact that, uh, the specification one where Mr. Franklin said, supposedly said, take your country ass on this. She was on the elevator. That was what they said that Mr. Franklin said in regards to the security guard. But you look at what the manager of the security guard described the security guard is. We only heard the one side of the story. Mr. Franklin said the conduct never happened. Okay. That's what he specifically said. It never happened. But the question becomes, if it happened, what other, because she said that all she did was that he asked her to get on the elevator and she said, no, you know, but I mean, you look at the, the manager's description of her own security guard and specifically on  she said that she wanted that security guard out of the building. The building manager wanted the guard out of the building is what she wanted. Now, what's interesting is, I'm not, I'm not understanding your point, not withstanding how rude the security guard may have been on occasion with respect to the clientele around the customers. Why does that affect, assuming that he said it or that the AJ credited her with the fact that he made the statement, why that mitigates or changes the effect of that statement? No, I'm just suggesting, I'm suggesting, Your Honor, that based on the way that she is, that Mr. Franklin would not have said that to her. I mean, and, and, well, I think that's, it's, it's difficult, I think at this point for us to discredit the finding made by the administrative judge as to whether that statement was made. I, I think absent just overwhelming evidence that this was not true, it's, it, that's not something which we can really look behind the actual finding. And there's 10 floors in the building, Your Honor, in that building. I mean, some of the other things that was talked about in the record, Your Honor, is, like I said, Mr. Franklin's supervisor is stating specifically, that, they told Mr. Franklin, that the, they didn't, they didn't want him in his own work space talking to people in his work space, period. Because he would, they would have conversations and he would butt in. And as a result, they told him he couldn't have conversations at work unless they were work related. So, he basically, he was told that he could take his breaks away, he should take his breaks away from his desk. So, basically take his breaks and his lunch away from his desk. And, you know, that's on page 56 of the appendix. And what Mr. Franklin did is, he stayed out of that area. He just stayed away from that area. And the only thing he was normally doing, doing when he went to that guard station, and as one of the witnesses testified, him standing there for 40 minutes, is a lot of times he was just reading the newspaper. I mean, he was just standing there reading the newspaper or whatever. And, you know, every now and then somebody would say something to him and he would say, you know, somebody would say, the security guard would say, hey, will you show that person this and he would take the person around or whatever. But the supervisor, the manager of the building specifically stated that she never told Mr. Franklin that he couldn't stand by the security guard station. I mean, that was her own testimony. She never told Mr. Franklin that. Very well. Thank you. So, to the court's questions. I think we have no further questions. Thank you. Thank you, Mr. O'Neill. That's good. Thank you.